612 A.2d 407

COMMONWEALTH of Pennsylvania, Appellee,

v.

Kevin PELZER, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 21, 1992.

Decided May 29, 1992.

238

---

Jeffrey M. Kolansky, Philadelphia, for appellant.

Ronald Eisenberg, Deputy Dist. Atty., Catherine Marshall, Chief, Appeals Div., Kathy L. Echternach, Philadelphia, Robert A. Graci, Chief Deputy Atty. Gen. for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and CAPPY, JJ.

## ORDER

PER CURIAM.

The court being unanimous as to the conviction and equally divided as to the sentence, the conviction and sentence of the court of common pleas are affirmed.

PAPADAKOS, J., did not participate in the consideration or decision of this case.

FLAHERTY, J., files an opinion in support of affirmance joined by LARSEN and McDERMOTT, JJ.

NIX, C.J., files an opinion in support of vacating sentence of death.

ZAPPALA, J., files an opinion in support of vacating sentence of death joined by CAPPY, J.

## OPINION IN SUPPORT OF AFFIRMANCE

FLAHERTY, Justice.

Appellant, Kevin Pelzer, was sentenced to death following his conviction of kidnapping and murdering Alexander Porter. In this direct appeal, he alleges various errors in his trial, jury instructions, and sentencing hearing. Following a meticulous review of the proceedings and the legal arguments, we affirm the judgment of sentence.

Appellant was tried jointly with three co-conspirators, all of whom were convicted of murder, kidnapping, conspiracy, and other felonies. Evidence at the trial revealed that the murder occurred under the following circumstances.

The victim was sixteen-year-old Alexander Porter. It was allegedly "common street knowledge" that his father was a

drug dealer with substantial assets. Sometime in January or February of 1988, appellant, together with Henry Daniels, a co-defendant, and Daniels' cousin, Stacey Torrance, also a co-defendant, conceived the idea of kidnapping Porter for money. Torrance was dating Sarita Porter, the victim's sister, and he provided information about Porter's parents and their assets. In July and August of 1988, the plan began to take shape, centered around a fake drug deal. It was agreed that Daniels would pose as a drug dealer named "Harry" who would supply Porter with cocaine. Appellant and Daniels enlisted a neighbor, Eugene McClure, the final co-defendant, in August, 1988.

The plan was placed in action on Friday night, September 1, 1988, around 10:00 p.m. Appellant and Daniels met the victim and Torrance, purportedly to consummate the drug deal, and went to appellant's house, where Daniels was also living. Daniels and Torrance left appellant's house as if to pick up the cocaine. When they returned to appellant's basement, Daniels was escorting Torrance, bound with ropes, pretending that Torrance had blundered and the deal had gone haywire. This charade was to justify an assault on Porter. They held a gun on him, forced him to lie on the floor, hog-tied him, gagged him, then placed him in the trunk of his own car, pretending that they considered him a participant in Torrance's purported bungling of the deal. While Porter was being bound, Torrance was led outside, supposedly to be punished, but actually to be released. Porter was later told that the conspirators had killed Torrance, and that the same thing would happen to Porter if he did not cooperate with the kidnappers.

Faced with such threats, Porter yielded the keys and telephone numbers of both of his estranged parents' separate apartments and information as to where they kept their valuables. In response to the kidnappers' questioning, he predicted that his father would probably pay whatever amount of ransom the kidnappers demanded. Twice during the next twenty-four hours while Porter was kept in the car trunk, the kidnappers used Porter's car on excursions, returning each time to McClure's garage which was five doors away from appellant's house. First, they used the vehicle to get to

Porter's parents' apartments to commit burglaries. After they returned, they discovered that Porter's ropes and gag had come loose. They retied the athletic sock used to gag him and the ropes securing his wrists and ankles, then stuffed the trunk with milk crates and sofa cushions to prevent him from moving around and loosening his fetters. Later they sallied out to dispose of him. On this expedition, they were chased by a neighborhood crime watch group and failed to find a secluded place to leave Porter, so they returned to McClure's house to wait until after dark. Appellant and Daniels went home, slept for a few hours, then took Porter to a park, shot him four times in the neck and back with a .25 caliber handgun, and left him by the roadside where his body was discovered the following day.

The jury found appellant guilty of first degree murder and, following a sentencing hearing, returned a verdict of death. This direct appeal followed.

■ Appellant raises seven allegations of trial errors, improper jury instructions, and errors during the sentencing phase. First, he claims error in the admission of certain evidence whose prejudicial effect allegedly outweighed its relevance. Three photographs, seized from the basement of appellant's house, were admitted into evidence. The photos depicted five young men, including appellant and co-defendant Daniels, dressed in army fatigues. Appellant argues that the only reason to introduce these pictures was to imply to the jury that appellant and Daniels were part of a paramilitary group. He claims that the prejudicial effect of such an implication far outweighs the relevance of the photographs.

The photographs, however, though introduced in evidence, were never shown to the jury. It is therefore unlikely that they could have engendered prejudice in the minds of the jurors. The Commonwealth introduced the photos through the testimony of the police sergeant who had seized them pursuant to a warrant in the basement of appellant's house, for the purpose of showing the association between appellant and Daniels. *See Commonwealth v. Wilson*, 431 Pa. 21, 244 A.2d 734 (1968), *cert. denied*, 393 U.S. 1102, 89 S.Ct. 901, 21

L.Ed.2d 794 (1969) (photograph showing appellant and two co-defendants properly admitted as circumstantial evidence that the three were often companions).

Because army fatigues are common attire, it is unlikely that the jury would have drawn the inference that appellant and Daniels were part of a "paramilitary group." To forestall such a possibility, however, the court permitted the defense to introduce a magazine photograph of the rap group, Public Enemy, dressed in fatigues, to substantiate that the defendants' dress style merely imitated the group which, according to testimony at trial, advocated nonviolence. The photographs of appellant and his friends were relevant to show his association with Daniels, and would not have created a bias in the minds of the jurors which would have deprived appellant of a fair trial.

■ Appellant argues similarly that it was error to admit into evidence a .380 automatic pistol seized from appellant's house, due to its alleged irrelevance and prejudicial impact. The pistol was introduced to substantiate the Commonwealth's proof that the conspirators had access to and used a second weapon during their criminal venture, in addition to the murder weapon, which was a .25 caliber handgun. Appellant's defense to his admission that he shot the victim was that Daniels held a gun to his head and forced him to shoot Porter; he argues that Daniels' gun was a .38 caliber revolver, not an automatic, and that the two bear no resemblance to each other. Thus, he concludes that the .380 automatic admitted in evidence was irrelevant, and that it was clearly prejudicial.

At the time of their arrests, appellant and all three co-defendants gave written statements, redacted versions of which were introduced at trial. Co-defendant Torrance described the abduction of Porter, in which Porter was made to lie on the floor while threatened with what Torrance thought was a .38 revolver. Appellant's statement alleged that Daniels later told him to shoot the victim while pointing "a gun" at his head, but appellant did not describe the weapon. Thus, instead of testimony definitely identifying the second weapon as a .38 revolver, which, appellant argues, "does not remotely

resemble a .380 automatic," the record contains only speculative identification of the gun by Torrance, and no identification by appellant, who was not even sure of the type of weapon he himself used to shoot the victim. Admission of the challenged weapon, therefore, was not error.

 Appellant's next allegation of trial error concerns the Commonwealth's display of a chart throughout the trial in order to outline police testimony identifying numerous items of evidence and the locations from which they were seized. Appellant claims that the use of the chart was tantamount to note-taking by the jury, an activity not permitted in Pennsylvania. Pa.R.Crim.P. 1113; *In re Thirty West Broad Street Corp.*, 425 Pa. 36, 227 A.2d 827 (1967).

The chart in question was exhibit C–15. It listed across the top the five addresses from which relevant evidence was seized, and under each address, the evidence seized from that location, grouped according to eleven different property receipts. Visual aids may be used to assist the jury in understanding the evidence in appropriate cases, and permission to do so is within the sound discretion of the trial judge. *Commonwealth v. Crawley*, 514 Pa. 539, 552, 526 A.2d 334, 340–41 (1987). Use of such visual aids is not equivalent to jury note-taking, and appellant does not allege that the trial judge abused his discretion nor suggest that his right to a fair trial was prejudiced in any way. Accordingly, we reject this argument.

 Appellant's next two arguments relate to allegedly improper jury instructions. The first claim is that the trial judge improperly expressed his opinion that the victim died of gunshot wounds, taking away the fact-finding function of the jury, which might otherwise have found that the victim died of strangulation prior to the shooting. Appellant supposes that, without this expression of opinion, the jury would have found him guilty of the lesser offense of second degree murder.

Appellant fails, however, to identify any statement in the record where the court expressed an opinion as to the cause of death. In the jury instructions, which we have reviewed in

their entirety, the only comment arguably supportive of appellant's claim is the statement: "There is evidence in this case that the killing was caused by a gun." The assertion is perfectly correct, based on the expert testimony of the medical examiner during the trial. It is within the province of the trial court to summarize evidence, so long as the court makes no material misstatements. *Commonwealth v. Irwin,* 494 Pa. 277, 282, 431 A.2d 257, 259–60 (1981). Summarizing evidence is not the equivalent of expressing an opinion as to the conclusions to be drawn from conflicting evidence. The court's statement was not the expression of an opinion on the cause of Porter's death. Moreover, the jury was instructed to decide whether Porter died of gunshot wounds and, if so, who inflicted those wounds. The instruction was: "It will be your duty in this case to determine whether Alexander Porter died as a result of gunshot wounds...." Furthermore, the court instructed the jury that it was not bound to accept the expert's opinion that Porter died from gunshot wounds, and that the jury was the sole judge of the facts. Finally, the charge did not undermine appellant's defense, which was that malice was lacking because appellant thought the victim was dead when he shot him. The jury was free to find appellant guilty of second degree murder on this basis regardless of whether the gunshots actually killed Porter. That the jury rejected this possibility does not render the instructions improper.

■ Appellant also claims that the court improperly refused to give an instruction on duress. His defense was based in part on his post-arrest statement, read into evidence at the trial, which contained his account of shooting the victim. He admitted firing the shots wounding Porter's neck and back, but claimed that he did so only because Daniels pointed a gun at his head and told him to shoot Porter. Appellant requested a charge on duress based on 18 Pa.C.S. § 309, which provides:

§ 309. Duress

(a) **General rule.**—It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another,

which a person of reasonable firmness in his situation would have been unable to resist.

**(b) Exception.**—The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress....

The trial court refused to charge the jury on this defense, holding that the exception of § 309(b) applied as a matter of law and precluded the defense of duress. We agree.

The relevant portion of appellant's statement is as follows:

Question: How did he tie the boy up?

Answer: He used a rope and he tied the boy's feet and hands behind his back and around his neck. I told him to take the rope off the boy's neck. He told me to shut up. *Then I went upstairs. I was going to tell my mom about what was happening downstairs but I didn't. I came downstairs a few minutes later* and I didn't see the boy. I asked him where was the boy. He said don't worry about it, the boy is taken care of. The other guy is downstairs too. He wasn't tied up at this time. And me and the other guy got into the boy's car, the black shiny one to drive one of the guys home. I drove the car. We dropped him off and returned to my house.

. . . .

Question: What happened after you and he parked the dark shiny car?

Answer: Then me and him walked to a guy's house. I've been knowing him for about three years. When me and him get to the other guy's place, he told him and two others what we was up to. *Then I told them I'm going to my house for a few minutes. I went home and I went back a few minutes later....*

We went back to the other guy's house. *I leave and go to my house. I come back a few minutes later* and the boy Alex still tied up and he is lying on the sofa in the garage. One of them was talking to the boy and asked the boy if his parents would pay to keep him alive. The boy said yeah. One of the guys was upstairs in the house. The other guy

put the boy back into the trunk and closed the trunk. Now it's daylight. *And me and one of the guys go to my house. Me and him went to bed and slept a couple of hours. While he was eating in my house I got the car keys from his jacket pocket and I slipped out* and went to open the trunk and the boy was stiff and I shook him but couldn't wake him. I saw the sofa cushion in the trunk. *I went to my house, I put the keys by his jacket.* Then he and me go, the two of us and open the trunk and he can't wake the boy. He and I get in the car and he drives to the lot or park like area. It was late Friday night when we pulled over and he took the boy from the car and put him on the ground.

. . . .

Question: What happened next?

Answer: He had two guns down his pants, he handed me the gun. I think it was a .25 automatic. He took out the other gun and then he said dump.

Question: What does the word dump mean?

Answer: Shoot.

Question: What happened next?

Answer: Then he pointed his gun at my head and said go ahead. And I fired at the boy three or four times.

(Emphasis added.)

The emphasized portions of the statement make it abundantly clear that appellant had frequent opportunities to withdraw from the conspiracy if that had been his intent, but he repeatedly returned voluntarily to continue the criminal operation. His self-serving statement also implies that throughout the episode he was being coerced into participating in brutal acts which were repugnant to his kinder nature. Nothing, however, can be more obvious than that he knowingly placed himself a situation in which it was probable that he would be subjected to duress. As a matter of law, then, the defense of duress was not available to appellant. His own assertions defeated any claim of duress, and there was no other evidence supporting the defense, so it was proper for the trial court to refuse to charge the jury on duress. *See Commonwealth v. Capitolo,* 508 Pa. 372, 379, 498 A.2d 806, 809–10 (1985) (court

properly refused to instruct on justification defense where proffered evidence was legally insufficient to establish all elements of defense); *Commonwealth v. Simmons*, 504 Pa. 565, 569, 475 A.2d 1310, 1313 (1984) (defendant not entitled to self-defense instruction where he did not testify at trial and his pretrial statements to police were legally insufficient to make out defense); *Commonwealth v. Musi*, 486 Pa. 102, 108, 404 A.2d 378, 381 (1979) (defendant was not entitled to charge on homicide by misadventure where version of facts most favorable to her would not satisfy legal elements of defense).

Appellant cites 18 Pa.C.S. § 503 as a defense, suggesting that he was entitled to a charge on justification. The statute, however, requires that "the harm or evil sought to be avoided by such conduct *is greater than* that sought to be prevented by the law defining the offense charged." 18 Pa.C.S. § 503(a)(1) (emphasis added). The harm appellant allegedly sought to avoid by shooting Porter, namely, his own injury or death, was not *greater than* the harm sought to be prevented by the law against murder, namely, the death of the victim. Therefore, appellant would not have been entitled to a charge on justification even if he had requested it. *Commonwealth v. Capitolo, supra; Commonwealth v. Simmons, supra; Commonwealth v. Musi, supra.*

Appellant challenges the sufficiency of the evidence to prove beyond a reasonable doubt three of the four aggravating circumstances found by the jury during the sentencing phase of the prosecution. His first argument is directed against the finding that the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8). Appellant claims that the evidence of tying the victim's hands and feet with a rope which went around his neck, tying a sweatsock around his mouth and neck, and storing him in the trunk of a car for a day failed to establish intent to cause pain and suffering to the victim.

Torture is "the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." *Com-*

*monwealth v. Pursell,* 508 Pa. 212, 239, 495 A.2d 183, 196 (1985). Moreover, it may be inferred from facts indicating a victim sustained considerable pain and suffering that a killer intended to cause such pain and suffering; a jury may infer from the manner of death that reasons other than overcoming resistance or silencing a victim were at play in the killing. *Commonwealth v. Proctor,* 526 Pa. 246, 260, 585 A.2d 454, 461 (1991); *Commonwealth v. Breakiron,* 524 Pa. 282, 294, 571 A.2d 1035, 1040–41, *cert. denied,* —— U.S. ——, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990); *Commonwealth v. Steele,* 522 Pa. 61, 77, 559 A.2d 904, 912 (1989).

The record in this case includes sufficient evidence from which the jury could have determined that the conspirators intentionally inflicted injuries far beyond those necessary to carry out their larcenous intentions and kill the victim, and could thus have concluded, beyond a reasonable doubt, that the offense was committed by means of torture. The medical examiner testified that Porter suffered more than forty abrasions on his face, forehead, abdomen, ankle, and calf before he died. He also testified that death was caused by both the strangulation and gunshot wounds. He gave his opinion, however, that after the strangulation, Porter remained alive until he was shot. The killers had several guns at their disposal. Rather than simply killing Porter, they chose to lock him in the trunk of his car for twenty-four hours, suffocating and terrorizing him, to drive him around, battering him, and to strangle him. Only then did appellant finally put an end to his pain and suffering by shooting him. In *Commonwealth v. Holloway,* 524 Pa. 342, 355, 572 A.2d 687, 694 (1990), we stated: "Since they came armed with a shotgun, the jury could find that the strangulation was but a cruel prelude to an intended denouement by that gun. It was not unreasonable for the jury to infer from the evidence presented that it was the intent of both the appellant and co-defendant to first torture the victim." In this case, the barbarous treatment of the victim was more protracted and pronounced than in *Holloway,* and the evidence manifestly supports the jury's finding that the offense was committed by means of torture.

Appellant also challenges the evidence to support the aggravating circumstance of killing a prosecution witness to prevent his testimony, 42 Pa.C.S. § 9711(d)(5). He claims that the Commonwealth failed to produce direct evidence that killing Porter was a premeditated, essential element of appellant's plan.

This aggravating circumstance encompasses the killing of a potential prosecution witness, even when no criminal proceeding is pending at the time of the murder, if the killer's intention to eliminate the victim as a potential witness is established through direct evidence. *Commonwealth v. Henry*, 524 Pa. 135, 152, 569 A.2d 929, 937 (1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991); *Commonwealth v. Strong*, 522 Pa. 445, 457, 563 A.2d 479, 485 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990); *Commonwealth v. Appel*, 517 Pa. 529, 537–38 n. 2, 539 A.2d 780, 784 n. 2 (1988). The Commonwealth presented evidence that appellant decided to eliminate Porter because he could identify appellant's house where the criminal episode began. Daniels, appellant's co-defendant, testified that appellant told him they "got to get rid of him because he knows my mom's house." Proof of appellant's intention to eliminate the victim as a potential witness was thereby established through direct evidence.

Appellant's third challenge of the aggravating circumstances is directed against the finding that the victim was being held for ransom or reward, 42 Pa.C.S. § 9711(d)(3). He claims that there was insufficient evidence of this circumstance, for although the conspirators contemplated ransoming the victim, they quickly abandoned the idea without acting on it.

Nevertheless, abundant evidence supports the finding that Porter was held for ransom, and that the conspirators acted on that plan. Whether or not they communicated a ransom demand or received a ransom payment is irrelevant. The co-defendants' statements and testimony established that part of the plan was to seek ransom from Porter's parents, that the plan was communicated to Porter, and that Porter was or-

dered to give them his parents' telephone numbers. Appellant's statement, introduced in evidence, maintained that "the whole idea of this thing" was to "kidnap the boy for money." In the face of this and other evidence that that was the purpose of the plot, the sufficiency of the evidence to support the jury's finding of this aggravating circumstance is clear.

Appellant's next contention is that the prosecutor made improper remarks during his argument in the sentencing phase of trial. He objects to the prosecutor's argument that the defendants shot Porter and then "left him lying out there like a piece of trash," and that the jurors should "show [the defendants] the same mercy they showed Alexander Porter."

Generally, the remarks of a prosecutor in closing argument do not constitute reversible error unless the unavoidable effect would be to prejudice the jurors, creating in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render an impartial verdict. *Commonwealth v. Holloway*, 524 Pa. at 353, 572 A.2d at 693; *Commonwealth v. Hardcastle*, 519 Pa. 236, 254, 546 A.2d 1101, 1109–10 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). The remarks objected to were based on the evidence and were not the extreme types of statements which unavoidably create fixed bias and hostility. The assertion that the victim was treated like "a piece of trash" was a fair observation after appellant stated that the killers "dumped" Porter on the ground and that appellant "took the shit that was in the trunk and threw it on the ground" prior to shooting Porter. It was also proper to argue that the jurors should not base their verdict on mercy, but on the evidence before them, arguing that the defendants had shown no mercy to the victim. *See Commonwealth v. Hardcastle*, 519 Pa. at 253–54, 546 A.2d at 1109 (prosecutor properly argued, based upon evidence, that the killing was without mercy); *Commonwealth v. Banks*, 513 Pa. 318, 355, 521 A.2d 1, 19, *cert. denied*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987) (prosecutor properly argued that jurors should not base

verdict on mercy because appellant showed no mercy or sympathy to victim).

Appellant's final argument is that the court's instructions to the jury in the sentencing phase were improper. He argues that the court should have informed the jury orally of the consequences which would ensue if it failed to reach a unanimous verdict, and that the process of weighing aggravating and mitigating circumstances was to be a qualitative one. Failure to give the suggested instructions, he claims, violated the principle that: "It is the responsibility of the courts to channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Commonwealth v. Nelson*, 514 Pa. 262, 279, 523 A.2d 728, 737, *cert. denied*, 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987), quoting *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398, 406 (1980).

There was nothing erroneous in the challenged jury instructions. Appellant's first assertion is factually incorrect. The jury was informed, both orally and in writing, that a verdict of death must be unanimous. The court stated:

> The sentencing statute provides that the verdict must be a sentence of death if the Jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the Jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.
>
> . . . .
>
> Remember again that your verdict must be unanimous; it cannot be reached by a majority vote or by any percentage, it must be the verdict of each and every one of you.

The printed verdict form sent out with the jurors also informed them, in accordance with Pa.R.Crim.P. 358A, that if they failed to reach a unanimous sentencing verdict, the judge would sentence the defendant to life imprisonment.

■ Appellant's claim that the court's instructions emphasized a quantitative approach is equally meritless. The court instructed the jury in the statutory language quoted above, and repeatedly used the term "outweigh" in explaining the process to be followed by the jury. "Outweigh" means to exceed in weight, value, or importance, while "outnumber" means to exceed in number. Webster's Ninth New Collegiate Dictionary (1985). The court never suggested that a quantitative approach should be followed, i.e., that the jury should determine whether aggravating circumstances outnumbered mitigating circumstances. *See Commonwealth v. Holland,* 518 Pa. 405, 419, 543 A.2d 1068, 1075 (1988). We therefore reject appellant's challenges to the jury instructions given in the penalty phase of the trial.

■ Although appellant does not allege that the evidence is insufficient to sustain the verdict against him, this court is required in capital cases to review the sufficiency of the evidence. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Bryant,* 524 Pa. 564, 567, 574 A.2d 590, 592 (1990).

■ We have examined the record and find ample support for every element of the crimes for which appellant was convicted: first degree murder, kidnapping, robbery, conspiracy, and two counts of burglary. Appellant's confession and Daniels' testimony constitute incriminating evidence of the most damning nature. This was supplemented by extensive additional evidence of every aspect of the twenty-four hour criminal enterprise.

■ Finally, in accordance with our duty to review sentences of death from the standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer,* 500 Pa. at 62, 454 A.2d at 961, and 42 Pa.C.S.

§ 9711(h)(3)(iii), we have reviewed the sentence imposed upon appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). We perceive no excess or disproportionality in the sentence imposed. Further, the record does not provide any basis for belief that the sentence was the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, the sentence must be affirmed.

Judgment of sentence affirmed.[1]

LARSEN and McDERMOTT, JJ., join in this opinion.

NIX, Chief Justice, in Support of Vacating Sentence of Death.

While I join in the result reached by the other members of the Court, that the evidence offered was sufficient to warrant the conviction of appellant, I strongly disagree with their finding that the Commonwealth's evidence was sufficient to sustain one of the aggravating circumstances involved, 42 Pa.C.S. § 9711(d)(8) (offense committed by means of torture).

As this writer stated in *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987), implicit in subsection (d)(8) of 42 Pa.C.S. § 9711 is "the requirement of an intent to cause pain and suffering *in addition to the intent to kill* ". *Id.* 514 Pa. at 280, 523 A.2d at 737 (emphasis added). Instantly, the facts of record do not satisfy this distinction between the specific intent to kill vis-a-vis the *independent,* specific intent to inflict pain and suffering. It is this latter requirement of specific intent that is necessary to elevate the crime to a level of heinousness that warrants the finding of the aggravating circumstance. Transporting a victim, bound and gagged in the trunk of a car, while callous and despicable, reflects only a course of conduct designed to effectuate the criminal intent of

1. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).

the eventual murder, rather than a specific and independent desire to inflict pain and suffering upon the victim.

However, there was evidence offered to sustain the finding of the two additional aggravating circumstances challenged by Appellant, namely, killing a prosecution witness to prevent his testimony, 42 Pa.C.S. § 9711(d)(5) and holding the victim for ransom or reward, 42 Pa.C.S. § 9711(d)(3). Having concluded that consideration of a third aggravating circumstance was improper and affected the weight of the evidence available at the penalty phase of the trial, I would vacate the sentence of death and remand the matter to a new fact finder in order to reweigh the mitigating and aggravating circumstances at a new penalty hearing.

ZAPPALA, Justice, in Support of Vacating Sentence of Death.

I agree with the majority that the evidence was sufficient to sustain the jury's verdict of murder in the first degree, kidnapping, conspiracy, and other felonies. I would vacate the death sentence and remand for a new penalty hearing, however, for the reasons stated in my concurring and dissenting opinion filed in *Commonwealth v. Daniels*, —— Pa. ——, 612 A.2d 395 (1992).

CAPPY, J., joins in this Opinion In Support of Vacating Sentence of Death.