J-S01006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JERMAINE JACKSON, | : | |
| | : | |
| Appellant | : | No. 1810 EDA 2013 |

Appeal from the Judgment of Sentence May 23, 2013
in the Court of Common Pleas of Bucks County,
Criminal Division, No. CP-09-CR-0003598-2012

BEFORE:  GANTMAN, P.J., MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:　　　　　　　**FILED APRIL 07, 2016**

Jermaine Jackson ("Jackson") appeals from the judgment of sentence imposed following his convictions of murder of the second degree, robbery, criminal conspiracy (robbery), and criminal conspiracy (burglary).  ***See*** 18 Pa.C.S.A. §§ 2502(b); 3701(a)(1)(i); 903(c).  We affirm.

The trial court set forth the relevant factual and procedural history in its Opinion as follows:

> On December 28, 2011, at approximately 10:00 p.m., Officer Douglas Slemmer ["Officer Slemmer"] of the Bristol Township Police Department responded to a call regarding a shooting at 17 Crabtree Lane in Levittown.  Officer Slemmer discovered the victim, Danny DeGennaro ["DeGennaro"], deceased and bleeding from the chest in the home's entryway.  Only [] DeGennaro and his roommate, James Meszaros ["Meszaros"], were home at the time.  [] Meszaros testified at trial that he went downstairs to go to the bathroom, and when he returned, he saw [] DeGennaro walking towards him in the vestibule.  [] DcGennaro said "here we go," then his eyes rolled up in his head, he fell backwards, and [] Meszaros tried to catch him.  [] Meszaros did not see what preceded the shooting.  When [] DeGennaro fell to the ground, []Meszaros ran to seek help from his neighbor, Nick

Wilson ["Wilson"]. [] Wilson called 911, then tried to stuff t-shirts into [] DeGennaro's shotgun wound to stop the bleeding. Officer Slemmer testified that the shotgun wound was about two to three inches in diameter and that it was "bleeding profusely."

Officer Slemmer saw no signs of forced entry. He observed [that] a large amount of blood was on the stairs, walls, and floor of vestibule. The kitchen area also had a great deal of blood. Detective Timothy Furhmann ["Detective Furhmann"], who also investigated the scene that night, found a bullet case, shotgun wadding, and plastic sheathing from a shotgun shell in the kitchen. Detective Furhmann discovered a bullet hole in a wall in the living room. Furthermore, tire tracks were located in the grass behind the house. Bullet holes were later found in the shirts [] DeGennaro was wearing and his chest had over eighty-six shotgun pellets inside of it.

Dr. Erica Williams, a forensic pathologist, opined that [] DeGennaro's death was a homicide caused by a shot fired from about a three foot range. She testified that the blast injured [] DeGennaro's skin, ribs, pericardium, heart, right lung, diaphragm, and liver. [] DeGennaro lost a "significant" amount of blood and it was unlikely that he could have survived the shotgun wound.

Prior to the shooting, [] Wilson parked his Volkswagen [which was bearing a for sale sign and Wilson's telephone number,] behind [] DeGennaro's house[.] During the investigation[,] [] Wilson reported to Detective Gregory Beidler ["Detective Beidler"] that he [had] received a call at 9:30 on the evening of the shooting, regarding the vehicle [for sale], and he provided the detective with the incoming cell phone number …. Detective Beidler obtained the subscriber information from T[-]Mobile and determined that the number belonged to Dakita Boone[,] and the phone was used by her daughter, Tatyana Henderson ("Henderson"). The T[-]Mobile records also showed that [] Henderson was about 300 yards from [] DeGennaro's house when she called [] Wilson on December 28, 2011. The records also revealed that a number belonging to Danasia Bakr ["Bakr"] sent several texts to [] Henderson on the night of the shooting, including a text at 5:39 p.m. that said "can we do that thing wit Jermaine." [] Henderson texted [] Bakr the next day as well, saying "going outside to talk to Jermaine just in case." []

Henderson's phone records also showed that she made many calls to a number belonging to [Jackson].

Records for [Jackson's] phone number showed five calls to and from numbers belonging to Breon Powell ["Powell"] and Kazair Gist ["Gist"] just minutes after the shooting. The records for all five individuals showed that their phones were in the area of [] DeGennaro's house at the time of the shooting and that they [had] exchanged multiple calls and text messages that evening. Significantly, immediately after the shooting[,] at approximately 10:00 p.m., [] Bakr and [] Powell called [Jackson] multiple times.

On February 13, 2012, Superior Court Judge Paula Francisco Ott approved a hard wire for the cell phones belonging to [] Bakr, [] Henderson, and [Jackson]. … [] Bakr gave an interview to the Bucks County Detectives in which she implicated herself, [] Henderson, [Jackson], [] Powell, and [] Gist in the killing of [] DeGennaro. On March 29, 2012, [Jackson] was arrested in connection with the murder of [] DeGennaro.

At trial, [] Bakr testified that she acted as the get-away driver. On the day of the shooting, she and [] Henderson agreed to help [Jackson] rob someone who owed him money for drugs. [] Bakr and [] Henderson met [Jackson], [] Powell, and [] Gist at a parking lot in Trenton[, New Jersey]. [] Powell placed a gym bag in Bakr's trunk and instructed [] Bakr to follow the three men, who were [riding] in [] Powell's car. The plan was for [Jackson] to go into the target's house to get the money[,] and if the target did not cooperate, [] Powell was to go into the house to hold the target at gunpoint. [] Bakr understood [Jackson] to be in charge of what they were going to do that night.

… [Jackson] directed [] Bakr to pull up to [] DeGennaro's house and [] Henderson to "call about the car," [*i.e.,* Wilson's] Volkswagen that was parked behind [] DeGennaro's house. As they sat in the car, [] Bakr could see two men inside [] DeGennaro's house. [Jackson] wanted [] Henderson to call regarding the car so he could see if either of the men [inside of DeGennaro's house] would answer. [] Henderson made the call at approximately 9:00 p.m. and was told she could test drive the car the next day.

After the phone call, the five drove around the neighborhood and stopped at another location. There, [Jackson] and [] Powell got out of the cars…. Both men were wearing gloves and had their faces covered. [Jackson] and [] Powell walked "around the corner" and [] Bakr could not see them anymore. [] Hendersen was on the phone with [Jackson] for about a minute after the two men disappeared.

Five minutes later, [] Bakr heard a noise that sounded like a shotgun. Bakr began to drive away, but [] Powell and [] Gist then ran to [] Bakr's vehicle and [] Powell pounded on her trunk, so she slowed her car down and let the two men into her car. [] Bakr noticed that [] Gist also had his face covered and was wearing gloves. According to [] Bakr, [] Powell and [] Gist seemed "jumpy." [] Powell stated "I had to do it, son" and [] Gist said "I shot him too." They instructed [] Bakr to drive away and she did. As they drove away, [] Powell was on the phone with [] Jackson. They met [Jackson] back at the parking lot in Trenton, where [] Powell got out of the car, removed a shotgun from his pants, and put it back in the gym bag that he placed in [] Bakr's trunk. [Jackson] got into [] Bakr's car, where he informed [] Bakr and [] Henderson that "it wasn't meant to happen this way," and he advised the two women not to say anything to anyone. [Jackson] then got into the other car with [] Powell and [] Gist and they all drove away. …

At trial, [] Henderson testified that on December 27, 2011, [Jackson] asked her to get []Bakr's car so that she could take him to Pennsylvania to "get money" from someone who owed him money. On December 28, 2011, [] Henderson sent [] Bakr a text message asking her if she was ready to go do "that thing with Jermaine." … [After approaching the home, Jackson] called [] Henderson and asked her to stay on the phone with him while they went inside. After about a minute, [] Henderson heard [Jackson] say "go ahead," and about a minute later, she heard two gunshots. …

[Jackson] was arraigned on June 22, 2012. On June 26, 2013, the Commonwealth filed a Notice of Joinder to [join Jackson's] trial with the trial of [] Powell and [] Gist. On August 8, 2012, [Jackson] filed an Omnibus Pre-Trial Motion and a Motion to Bar the Death Penalty as Unconstitutional. On September 7, 2012, the Commonwealth withdrew the death penalty. On April 25, 2013, [Jackson's] trial was severed from the trial of [] Powell

- 4 -

and [] Gist, and [Jackson's] Motion to Suppress was denied. On May 20, 2013, after a jury trial, [Jackson] was found guilty of [the above-mentioned crimes]. On May 23, 2013, [Jackson] was sentenced to life imprisonment. On June 14, 2013, [Jackson] filed a Notice of Appeal to the Superior Court[, and a court-ordered Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement.

Trial Court Opinion, 3/17/15, at 1-7 (citations omitted).

Jackson raises the following questions for our review:

1. Did the lower court err by not sustaining objections and declaring a mistrial following objections to the prosecutor's use, during closing argument, of PowerPoint slides manipulated to present unduly inflammatory images that were not in evidence?

2. Did the lower court err by not suppressing evidence of mobile phone usage obtained through the use of grand jury subpoenas that were issued without the affidavits required to show the necessity for the use of a grand jury subpoena to obtain the evidence sought?

3. Did the lower court err by admitting unfairly inflammatory evidence of [Jackson's] presence at a shooting range?

Brief for Appellant at 2.

In his first claim, Jackson contends that the trial court erred in denying his Motion for a Mistrial in light of the prosecutor's use of PowerPoint slides during closing argument that displayed words and images that were never introduced into evidence, and which created a prejudicial atmosphere. *Id*. at 14, 21-22. Jackson takes issue with three specific PowerPoint slides: (1) a slide that includes the words "go ahead" in red typeface, which according to Jackson appeared to be written by a blood soaked finger; (2) a slide that includes the words "get money" in red typeface, which appeared to be

written by a blood soaked finger; and (3) a slide that includes a picture of a cell phone inside manacles. *Id*. at 14-15, 21. Jackson argues that the slides inflamed the passions of the jury and formed in their minds bias and hostility toward him such that they could not objectively render a fair verdict. *Id*. at 15-16, 17; *see also id*. at 21-22 (asserting that the slide including the manacles unnecessarily emphasized that Jackson was black, while the victim was white). Jackson also claims that the trial court's cautionary instruction was inadequate to overcome this prejudice. *Id*. at 22.[1]

Our standard of review with regard to the denial of a motion for mistrial is as follows:

> In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, [a] declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must

---

[1] We conclude that Jackson preserved his claim regarding the PowerPoint slides by objecting to them following the completion of the prosecution's closing argument. *See Commonwealth v. Rose*, 960 A.2d 149, 154 (Pa. Super. 2008) (stating that a delay in objecting to conduct during closing arguments does not result in waiver so long as: "(1) there is no factual dispute over the content of the prosecutor's argument (*e.g.,* the argument was recorded and available for review at trial); and (2) counsel objects immediately after closing argument with sufficient specificity to give the court the opportunity to correct the prejudicial effect of the improper argument.").

discern whether misconduct or prejudicial error actually occurred, and if so, ... assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with the law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. The remedy of a mistrial is an extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.

*Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (citation, quotation marks, and brackets omitted).

With specific reference to a claim of prosecutorial misconduct in a closing statement, we must review the prosecutorial conduct to determine its prejudicial quality and the conduct cannot be viewed in isolation, but rather as a whole. *Id*. A prosecutor must have "reasonable" latitude and may engage in "oratorical flair" during closing arguments, where the statements are supported by the evidence and its reasonably derivative inferences. *Commonwealth v. Hogentogler*, 53 A.3d 866, 878 (Pa. Super. 2012). Parties are entitled to utilize visual aids during their closing arguments so long as the evidence and the inferences derived therefrom reasonably support the demonstrative aids. *Commonwealth v. Rickabaugh*, 706 A.2d 826, 837 (Pa. Super. 1997); *see also Commonwealth v. Pelzer*, 612 A.2d 407, 412 (Pa. 1992). In defining what constitutes impermissible conduct during closing argument,

Pennsylvania follows Section 5.8 of the American Bar Association (ABA)

Standards, which states as follows:

(a)   In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

(b)   The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c)   The prosecutor should not make arguments calculated to appeal to the prejudices of the jury.

(d)   The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

ABA Crim. Justice Stand. § 5.8 (3d ed. 1993); *see also Judy*, 978 A.2d at 1020.

Furthermore, "prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Judy*, 978 A.2d at 1020; *see also Commonwealth v. Fisher*, 741 A.2d 1234, 1243 (Pa. 1999) (stating that even isolated references to evidence not of record will not necessarily be considered "so pervasive or deliberate so that the unavoidable effect thereof [is] to prejudice the jury to the point that they could not fairly weigh the evidence presented."). Thus, "an allegation of prosecutorial misconduct requires us to

evaluate whether a defendant received a fair trial, not a perfect trial." ***Judy***, 978 A.2d at 1019.

Here, during his closing argument, the prosecutor utilized a PowerPoint presentation. N.T., 5/20/13, at 101-05. Two slides showed the phrases "get money" and "go ahead" printed in red lettering. ***Id***. at 102, 104-05. Defense counsel noted that the "get money" slide was shown to the jury for seventeen minutes and the "go ahead" slide was shown to the jury for four minutes. ***Id***. at 102, 105. The prosecution also utilized another slide that depicted manacles with a cell phone inside.[2] ***Id***. at 103-04. Defense counsel objected to the use of these three slides following the completion of the prosecution's closing argument, and sought a mistrial. ***Id***. at 102-06. The trial court denied the Motion for a mistrial. ***Id***. at 106. However, the trial court provided the following cautionary instruction to the jury:

> The speeches given by the lawyers are not part of the evidence[,] and you should not consider them as such. However, in deciding the case, you should carefully consider the evidence in light of the various reasons and arguments which each lawyer presented. It is the right and duty of each lawyer to discuss the evidence in a manner which is most favorable to the side he represents. You should be guided by each lawyer's arguments to the extent they're supported by the evidence and insofar as they aid you in applying your own reason and common sense. However, you're not required to accept the arguments of either lawyer. It is for you[,] and you alone[,] to decide the case based on the evidence as it was presented from the witness stand and the instructions I'm giving to you.

---

[2] The record does not indicate how long the PowerPoint slide with the manacles was displayed to the jury.

I would also mention that there were illustrations used during the course of the closing statements. These are not evidence. They are simply illustrations[,] and you should consider them as such. To the extent that any illustrations that were shown appeal to your emotions, you need to set them aside and decide this case based solely on the evidence you heard in the courtroom[,] and the law as I've given it to you.

*Id*. at 114-15.

Here, the Commonwealth points out that the term "go ahead" referenced the words Jackson spoke to his co-conspirators prior to the shooting, and the term "get money" referenced the purpose of entering the residence. *See* Brief for the Commonwealth at 22; *see also* N.T., 5/17/13, at 175, 188, 189-90, 198, 218; N.T., 5/16/13, at 125; N.T., 5/14/13, at 10. Further, the Commonwealth points out that the image of the manacles with a cell phone inside was "to impress upon the jury how the extensive use of cell phone records by law enforcement was what led the police to [uncover Jackson's] and his co-conspirators' role in the murder, leading to their arrest and proscecution." Brief for the Commonwealth at 22. Jackson does not allege that any of the facts the prosecutor presented in the PowerPoint slides were not true, or exceeded the scope of the evidence presented. *See* Trial Court Opinion, 3/17/15, at 10. Our review discloses that the PowerPoint slides did not convey the prosecutor's personal belief or opinion on Jackson's credibility or guilt, did not appeal to the prejudices of the jury, and did not divert the jury from deciding the case on the evidence presented at trial. *See Judy*, 978 A.2d at 1020. Moreover, the trial court rejected Jackson's

- 10 -

claim that the words "get money" and "go ahead" were written in blood. *See* N.T., 5/20/13, at 102, 104-05, 108 (wherein the trial court rejected defense counsel's characterization of the red lettering to have been drawn in blood); *see also Commonwealth v. Hollingshead*, 111 A.3d 186, 194 (Pa. Super. 2015) (stating that we will not disturb the trial court's credibility determination). Nothing in Jackson's speculative arguments demonstrates that the slides prejudiced the jury in rendering a verdict.[3] In point of fact, Jackson has not pointed to any Pennsylvania authority that would suggest that the prosecution's summation could not include dramatic allusions, such as those found in the PowerPoint slides, which were within reasonable bounds of the evidence supplied at trial.[4] Thus, Jackson's suggestion that the use of any PowerPoint slides during closing arguments is somehow suspect is specious. *See Rickabaugh*, 706 A.2d at 837; *see also Pelzer*, 612 A.2d at 412.

Further, the trial court provided a cautionary instruction, which Jackson accepted at trial. *See Commonwealth v. Jones*, 668 A.2d 491, 503-04 (Pa. 1995) (stating that if the trial court issues a cautionary or

---

[3] We note that in rendering its verdict, the jury found Jackson not guilty of various other charges. *See* N.T., 5/20/13, at 217-20.

[4] Jackson points to various decisions in other jurisdictions to support his argument. Brief for Appellant at 19-24. While decisions from other jurisdictions may provide guidance to this Court, they are clearly not binding authority. *See Commonwealth v. Baldwin*, 8 A.3d 901, 904 n.3 (Pa. Super. 2010). Nevertheless, upon our review, the decisions cited by Jackson do not entitle him to relief based upon the facts of this case.

curative instruction, and no objection is subsequently raised, we presume that the jury followed the instruction and that the objecting party was satisfied with the instruction). Under these circumstances, the use of a PowerPoint presentation during closing argument to summarize facts and evidence produced at trial, combined with the cautionary instruction provided by the trial court, renders Jackson's first argument without merit.

In his second claim, Jackson contends that the trial court erred in failing to suppress telephone records obtained by a grand jury subpoena. Brief for Appellant at 22, 27-28. Jackson argues that the Commonwealth failed to provide a "Schofield affidavit," required by **Robert Hawthorne, Inc. v. Cty. Investigating Grand Jury**, 412 A.2d 556 (Pa. 1980), for each item of evidence sought from the subpoena. **See** Brief for Appellant at 23-25, 27; **see also id**. at 27 (wherein Jackson argues that the Commonwealth could not cure its error by filing the affidavit after Jackson pointed out the error in a Motion to Suppress). Jackson asserts that the Commonwealth filed a single "Schofield affidavit," even though it obtained multiple cell phone records. **Id**. at 23-24. Jackson further asserts that the Commonwealth did not establish an evidentiary nexus between the information sought and the investigation. **Id**. at 24.

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only

the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

**Commonwealth v. Jones**, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation, brackets, and ellipses omitted).

Here, Jackson has not demonstrated, through any citation to case law, that a consequence of the failure to file a "Schofield affidavit" is the suppression of evidence in a criminal proceeding. Indeed, the purpose of the "Schofield affidavit" is to set forth the procedure, in the context of a civil action, for a contempt hearing where the government sought to enforce a grand jury subpoena, and the subpoenaed person refuses to comply. **See Robert Hawthorne, Inc.**, 412 A.2d at 560-61. There were no enforcement proceedings on the phone records in this case and thus, the Commonwealth was under no obligation to file a "Schofield affidavit." **See** Trial Court Opinion, 3/17/15, at 12 (noting that the phone records were obtained

properly, given the broad powers of the grand jury).[5]  Accordingly, Jackson's

reliance on the alleged lack of a "Schofield affidavit," in the context of his

suppression motion, does not entitle him to relief.  **See, e.g., United**

**States v. Oliva**, 611 F.2d 23, 24-25 (3d Cir. 1979) (noting that defendant's

motion to suppress the grand jury testimony based upon the lack of a

Schofield affidavit was misplaced, as such affidavits deal with the procedure

to enforce the subpoena).[6]

In his third claim, Jackson contends that the trial court improperly

admitted evidence of his presence at a shooting range called "Ready, Aim,

Fire" with two of his co-conspirators.  Brief for Appellant at 28; **see also id**.

(wherein Jackson claims that the evidence included images of him shooting a

gun at the range, a "target used for firearm practice, digital images of

[Jackson] and co-conspirators at the establishment, and a statement made

by [Jackson] while at the establishment[.]") (citations omitted).  Jackson

---

[5] In any event, the trial court noted that the Commonwealth filed "Schofield affidavits" to show "that the information sought through the subpoenas was relevant to the murder investigation, the investigation was properly within its jurisdiction, and that the information was not being sought for another purpose."  Trial Court Opinion, 3/17/15, at 12; **see also Robert Hawthorne, Inc.**, 412 A.2d at 560-61 (stating that under the Schofield procedure, "the Government [is] required to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose…. [T]he Government's supporting affidavit should be disclosed to the witness in the enforcement proceeding.").

[6] We note that holdings of federal circuit courts does not bind this Court, but may serve as persuasive authority in resolving analogous cases. **Commonwealth v. Haskins**, 60 A.3d 538, 548 n.9 (Pa. Super. 2012).

argues that the "evidence tended only to blacken [his] character, portraying him as a person with an unusual interest in firearms[,] more likely than not to commit a violent act." *Id*. at 29. Jackson asserts that the evidence was unfairly prejudicial, and that he is entitled to a new trial. *Id*.

Initially, in his Rule 1925(b) Concise Statement, Jackson raised the following claim: "The [trial c]ourt erred in admitting, over [Jackson's] objection, evidence of his holding a gun at or around a firing range, as such evidence was not part of a common scheme nor otherwise relevant, and unfairly inflammatory and prejudicial." Concise Statement, 11/4/13, at 2 (unnumbered). Jackson did not raise any claims regarding the target used at the range, images of Jackson and his co-conspirators at the range, or statements made by Jackson in the Concise Statement. Thus, Jackson's claims in this regard are waived on appeal. *See Commonwealth v. Lane*, 81 A.3d 974, 979 (Pa. Super. 2013) (noting that any issues not raised in a Rule 1925(b) concise statement are waived on appeal); *see also* Pa.R.A.P. 1925(b)(3)(iv).

Furthermore, with regard to the Jackson's claim that the trial court improperly admitted evidence of Jackson shooting a gun at the range, we note that, aside from a single sentence, Jackson has not developed this claim in his appellate brief. *See Commonwealth v. Freeman*, 128 A.2d 1231, 1249 (Pa. Super. 2015) (stating that "[t]he failure to develop an adequate argument in an appellate brief may result in waiver of the claim

under Pa.R.A.P. 2119.") (citation omitted). Jackson's failure to develop a legal argument in support of his claim, and this Court's reluctance to act as his appellate counsel, results in a waiver of his claim. **See id**.[7]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/7/2016

---

[7] Even if we addressed the claim, the trial court did not abuse its discretion in admitting this evidence. **See Commonwealth v. Antidormi**, 84 A.3d 736, 749 (Pa. Super. 2014) (stating that the admission of evidence is within the sound discretion of the trial court and cannot be reversed unless the court abused its discretion). Here, the Commonwealth presented the evidence showing Jackson holding a gun at the shooting range to impeach Jackson's statement to the police that "he didn't like guns, he didn't own guns, and he never played with guns and he's never fired a gun." N.T., 5/17/13, at 126-27. Jackson has not demonstrated that the images implied that he was unlawfully at the range or that he could not use or own a gun. Instead, Jackson merely speculates, without any support, that any mention of a shooting range evidences an attempt to blacken his character by showing he would commit a violent act. Thus, the relevant and probative value of the evidence outweighs any prejudicial impact that the jury became aware that Jackson was seen with a gun. **See Antidormi**, 84 A.3d at 752 (stating that courts are not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged.").