J-S35019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARGARITA GARABITO, | |
| Appellant | No. 1670 EDA 2015 |

Appeal from the Judgment of Sentence Entered February 20, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000468-2010

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 20, 2016**

Appellant, Margarita Garabito, appeals from the judgment of sentence of life imprisonment without the possibility parole (plus a consecutive term of 22½-45 years' imprisonment), following her conviction for first degree murder and related offenses.  Appellant contends that the trial court violated her right to due process when it refused to instruct the jury on the defense of duress.  Appellant also alleges prosecutorial misconduct due to the prosecutor's suggesting that the defense had paid its expert witness to lie.  After careful review, we affirm.

The following facts were adduced at Appellant's jury trial:

> At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives Gregory Santamala and Norma Serrano, Philadelphia Police Corporal Maria Santa, Philadelphia Police Officer Christopher Reed, Philadelphia Fire Service Paramedic Raymond Mulderig, Assistant Medical Examiner Dr. Marlon Osbourn, Dr. Diego Jaramillo, Dr. Cindy Christian, Ethel

Elizabeth Horsey, Glenny Ferreira, Yolonda Deliz-Arroyo, Wanda Torres, Amy Ozenbaugh, Denise McGovern, Jose Lorenzo, Patricia Lane, Joshua Tyson, and Idaly Irizarry-Zayas. [Appellant] testified on her own behalf and presented the testimony of Dr. Jonathan Arden, Margaret Lorenzo, Cathy Garabito, Salvador Lorenzo, Gladys Lorenzo, Edwin Silva, and Julian Lorenzo. Viewed in a light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

Charlenni Ferreira ("Charlenni") was born in the Dominican Republic to Domingo Ferriera ("Domingo") and Rosalie Almeida in October of 1998. Domingo moved to the United States while Charlenni was three years old, leaving Charlenni in the care of her mother. Ultimately, Domingo moved to Philadelphia and began dating, and living with, [Appellant]. In May 2005, when Charlenni was six years old, Domingo arranged to have Charlenni join him in Philadelphia with [Appellant] and her children. When Charlenni first moved to Philadelphia, she was a happy, healthy child. However, in 2006, Charlenni's behavior and demeanor changed. In addition, Charlenni began wearing long pants and shirts, even in summer months. [Appellant] began to require Charlenni's adult older sister, Minty Ferreira ("Glenny["]), who did not live with [Appellant], to have an appointment to visit the home.

While Charlenni visited the school nurse, Amy Ozenbaugh, during her first grade year (2005-2006) for minor illnesses, her visits increased in her second grade year (2006-2007) and included visits for scrapes and bruising on her face, which ultimately prompted Ozenbaugh to file a report with the Department of Human Services ("DHS") in October of 2006. The DHS investigation revealed that Charlenni had multiple bruises and scrapes, as well as other marks under her clothing and a missing toenail. However, while the DHS investigation was ongoing, Charlenni's visits to Ozenbaugh decreased and the investigation was ultimately closed in March of 2007.

In June, 2007, Ozenbaugh noticed a round "puffy" area on Charlenni's lower back. While being examined, Charlenni stated, unprompted, that nobody was hitting her and that she was never "having any children because [she] would hate to have to hit [her] children if they were bad."

During her third grade year (2007-2008), Charlenni again had multiple visits to the nurse's office for fever, stomach aches, chest pain, and foot pain. Charlenni also complained of leg pain and pain in walking. After Charlenni reported back pain, a subsequent examination by the school nurse, Denise McGovern, revealed a small ulcer on Charlenni's back. McGovern directed [Appellant] to take Charlenni to hospital, which [Appellant] failed to do.

During her fourth grade year (2008-2009), Charlenni reported multiple times to McGovern's office for stomach ache and fevers. In October of 2008, family members and other individuals in Charlenni's life began noticing that Charlenni walked with a limp. In December of 2008, Charlenni began regularly wearing a hair weave. By April of 2009, Charlenni's ability to walk had deteriorated significantly, prompting McGovern to begin stressing the need for [Appellant] to take Charlenni to obtain a physical examination for her gait. [Appellant] excused Charlenni's walk by stating that Charlenni had fallen from the stairs and that she was overweight. [Appellant] explained Charlenni's hairpiece by stating that Charlenni wanted to have long hair.

McGovern again emphasized the need for [Appellant] to take Charlenni to a doctor to get a school physical at [the] beginning of Charlenni's fifth grade year (2009-2010). While [Appellant] ultimately took Charlenni to Dr. Ramesh Parchuri on September 12, 2009, McGovern was not satisfied with the examination performed by Dr. Parchuri and wanted [Appellant] to return Charlenni to the doctor for further examination.

Charlenni's father, Domingo, left Philadelphia for a month long trip to the Dominican Republic on September 18, 2009, returning on October 18, 2009. Charlenni did not report to school on Friday, October 16, 2009, or the following Monday through Tuesday, October 20-21, 2009.

In the early morning on October 21, 2009, [Appellant] woke her son and Charlenni in order to take them to school. Charlenni stated that she was not feeling well and needed to vomit. While Charlenni did not vomit in the bathroom, where [Appellant] had taken her, Charlenni did vomit upon returning to her bed and fell unconscious. At approximately 8:30 a.m., [Appellant] called 911 and paramedics responded to [Appellant]'s house shortly thereafter. Paramedics saw

- 3 -

Charlenni lying on the bed unresponsive and attempted to start CPR, but Charlenni's mouth purged a bloody black vomit. At that time, medical personnel believed Charlenni was dead and that any further resuscitation efforts would be futile. Charlenni was transported to St. Christopher's Hospital, where she was pronounced dead at 9:01 a.m. Upon arriving at St. Christopher's, Charlenni's body was examined and doctors noticed that Charlenni's rectum was torn. Realizing that Charlenni's death might involve a sexual assault, Medical personnel called police to the hospital.

While waiting at the hospital that morning, [Appellant] provided a statement to police, stating that Charlenni had wanted to throw up that morning but could not. [Appellant] further stated that Charlenni threw up and fainted upon returning to her bed. As the interview continued, [Appellant] told police that Charlenni had not been feeling well for a few days before her death and that she had fallen the night before. [Appellant] was ultimately transported to the Homicide Unit at police headquarters at approximately 11 a.m.

The Philadelphia Medical Examiner's Office conducted Charlenni's autopsy later that same day at 2:30 p.m. Present for the autopsy were several members of the Medical Examiner's staff, as well as Dr. Cindy Christian from the Children's Hospital of Philadelphia and Detective Philip Nordo from the Philadelphia Police Department. The external examination revealed that Charlenni suffered from scarring and bruising on her face, neck, chest, back, arms, and legs. Doctors also discovered a seven inch by four inch gaping wound on the left side of Charlenni's head, which had been covered by a hair weave that was affixed to Charlenni's scalp by bobby pins, which penetrated Charlenni's skin and scar tissue. Charlenni's skull was visible in this wound. While medical gauze had been placed between Charlenni's skull and the hair weave, the wound had received no additional medical intervention. Charlenni's skull also had signs of fractures and trauma and was thicker than it should have been as a result of healing from repeated injury. The external examination also showed that Charlenni suffered from a "cauliflower ear[,"] where her left ear had deformed due to repeated injury. Additionally, Charlenni had relatively recent trauma to her anus and vagina, suggestive of sexual trauma.

An internal examination of Charlenni revealed that Charlenni suffered from traumatic brain damage, specifically in

- 4 -

her hippocampus. Charlenni also had multiple bone fractures, of various ages, in her left hip, left arm, left shoulder blade, and ribs. As a result of the fractures to her ribs, Charlenni developed a pleural empyema over a period of several days prior to her death, which caused 750 milliliters of fluid to build up in her lung cavity, collapsing her lung and starving her body of oxygen. This pleural empyema ultimately caused Charlenni's death.

While doctors were conducting Charlenni's autopsy, police began questioning [Appellant] concerning the prior few days. Acting on information received from the autopsy, Police Lieutenant Reihl asked [Appellant] about the wound on Charlenni's head. When asked about the wound, [Appellant] struck her chest with her hand and stated, "I did it. I did it with a broomstick." [Appellant] was then given her Miranda warnings in Spanish. [Appellant] then repeated her statements about the events of that morning. When asked how Charlenni got her bruises, [Appellant] stated that she had "hit [Charlenni] with a metal broomstick handle over her head. There was blood. I put cotton in the cut and the I place[d] hair on top of the cut and on top of the cotton so no one would see it." [Appellant] stated she would hit Charlenni with brooms or "with whatever was near [her] to pick up." [Appellant] further confessed to hitting Charlenni on the prior Thursday with her hand. [Appellant] also stated that Domingo never slept in Charlenni's room and did not strike her. [Appellant] stated that she had been hitting Charlenni for over a year, but that the head wound was only three months old.

Trial Court Opinion (TCO), 8/24/15, at 2-7.

Appellant was tried by a jury for first-degree murder, 18 Pa.C.S. § 2502(a), conspiracy (first-degree murder),[1] 18 Pa.C.S. § 903, endangering the welfare of a child, 18 Pa.C.S. § 4304, and possessing an instrument of

_____

[1] Appellant's co-conspirator, Domingo, committed suicide prior to trial.

crime, 18 Pa.C.S. § 907.[2] The trial occurred on February 3-20, 2015, with the jury reaching a verdict on February 20, 2015. The jury convicted Appellant of all the aforementioned offenses. Appellant was immediately sentenced to life imprisonment without the possibility of parole for first-degree murder, a consecutive term of 20-40 years' imprisonment for conspiracy, and another consecutive term of 2½-5 years' imprisonment for possession of an instrument of crime. Appellant filed a timely, post-sentence motion, setting forth numerous claims, which was denied on May 27, 2015. Appellant then filed a timely appeal.

Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement, and the trial court issued its Rule 1925(a) opinion on August 24, 2015. Appellant now presents the following questions for our review:

> A. Whether the trial court violated Appellant['s] fundamental due process right to a fair trial by denying the defense request for a jury instruction on duress pursuant to Appellant's theory of defense that she did not have a specific intent to murder[,] and did not act or fail to act out of malice toward the child victim[,] but rather acted or failed to act out of fear of her abusive husband?
>
> B. Whether the Commonwealth['s] attorney engaged in prosecutorial misconduct by arguing to the jurors that they should not credit Dr. Arden's testimony on the grounds that his testimony favorable to the defense was not rendered in good faith by him as an expert in forensic pathology[,] but was simply contrived testimony specifically requested by and purchased by the defense?

_____

[2] Appellant was charged with additional offenses, which were *nolle prossed* prior to trial and, therefore, are not relevant to the instant appeal.

Appellant's Brief, at 2.

Appellant's first claim concerns the trial court's denial of her request

for a jury instruction on duress. "Duress is a defense to criminal culpability."

***Commonwealth v. Markman***, 916 A.2d 586, 606 (Pa. 2007).

> In deciding whether a trial court erred in refusing to give a jury instruction, we must determine whether the court abused its discretion or committed an error of law. Where a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record. When there is evidence to support the defense, it is for the trier of fact to pass upon that evidence and improper for the trial judge to exclude such consideration by refusing the charge.

***Commonwealth v. DeMarco***, 809 A.2d 256, 260-61 (2002) (citations,

quotation marks, and footnote omitted).

> The duress defense is codified as follows:
>
> **(a) General rule.--**It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
>
> **(b) Exception.--**The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

18 Pa.C.S. § 309. Thus, our Supreme Court has held that:

> [I]n order to establish the duress defense, the evidence must show that: (1) the defendant was subject to a present and impending threat of death or serious bodily injury; (2) the defendant had a reasonable fear that the threatened harm would

be made against him; and (3) the defendant had no reasonable opportunity to escape the threatened harm except by committing the criminal act.

*DeMarco*, 809 A.2d at 259.

Instantly, Appellant argues:

In the present case, [Appellant] was charged [with] murder in the first degree which required proof beyond a reasonable doubt that [Appellant] had the specific intent to kill the child, and charged in the alternative with third degree murder which required proof of malice on her part. In her defense[,] [Appellant] testified at length to Domingo Ferreira's threatening behavior and her fear for herself and her children if she exposed Ferreira's abuse of Charlenni. Given that evidence of record it was not for the court to decide that the jury could not reasonably find that [Appellant] did not have a specific intent to kill and did not act or fail to act out of malice toward the child by reason of her fear of Ferreira. Rather, it was solely the province of the jury to decide whether and to what extent [Appellant]'s fear of Domingo Ferreira affected her state of mind with regard to her conduct toward Charlenni and[,] to that end[,] [Appellant] was entitled to a jury instruction on duress. In fact, as acknowledged in the trial court's Opinion (at 25), citing []*DeMarco*, 809 A.2d [at] 261[], "(w)here a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by the evidence in the record[."] The court's analysis in its opinion of the applicability of duress to the facts of the case and claim that defense of duress did not apply was nothing more than a disguised usurpation of the exclusive role of the jury to decide the facts. The court was entitled to believe that [Appellant]'s claim of being constantly in fear for herself and her children of the gun–toting Ferreira and her claim that her fear persisted … even while he was away due to his and others' phone calls were not credible. But the court was not entitled to undercut the meaningfulness of [Appellant]'s testimony as to her defense by refusing to properly instruct the jury just because the court did not believe it. Accordingly, in view of the foregoing … the trial court's refusal to instruct the jury on duress in connection with the theory of defense presented by defense counsel on behalf of [Appellant] violated [Appellant]'s due process right to a fair trial.

Appellant's Brief, at 22-23.

We disagree. Initially, it is not true that Appellant's testimony regarding Domingo's abuse was 'undercut,' at least not completely, by the decision not to include a duress instruction to the jury. The jury was not precluded from considering Appellant's testimony as it was relevant to her *mens rea* for the charged offenses. The court's decision merely precluded a specific, affirmative defense, which would have been an absolute defense to Appellant's criminal culpability if accepted. Therefore, the decision did not usurp the jury's consideration of Appellant's testimony altogether.

Nevertheless, we must consider whether there were sufficient facts to suggest that the defense of duress was supported by the record. The trial court indicates that Appellant was not entitled to a duress instruction because:

> [T]he evidence at trial failed to support an inference that [Appellant] did not have a reasonable opportunity to escape threatened harm except by continuing to engage in the abuse of Charlenni. At trial, [Appellant] repeatedly stated that Domingo threatened her life, Charlenni's life, the lives of [Appellant]'s children, and his own life if [Appellant] informed police of the abuse which, [Appellant] claimed, Domingo had inflicted on Charlenni. However, Domingo was out of the country for a month shortly before Charlenni's death, returning three days before Charlenni died. During that month, Charlenni sustained additional injuries that led to her death. Clearly, no "person of reasonable firmness in [that] situation would have been unable to resist" any threats from Domingo to refrain from saving the life of a ten–year old child. 18 Pa.C.S. § 309(a). While [Appellant] testified that she never contacted police or any medical professional while Domingo was out of the United States because he "had people," N.T., 2/17/15[,] at 207-208, [Appellant] never testified whether this occurred within the

month prior to Charlenni's death or how Domingo oversaw her actions during the remainder of the time he was absent. N.T. 2/17/15[,] at 64-65.

[Appellant] had, at least, an entire month prior to Charlenni's death in which she could have taken Charlenni to the hospital, reported Domingo's alleged abuse, or simply stopped continuing the abuse that [Appellant] herself inflicted. N.T.[,] 2/17/15 at 188-189. [Appellant] was not entitled to a duress instruction.

TCO, at 26.

We agree. Under the test enunciated in *DeMarco*, Appellant was not subject to a "present and impending threat" during the month that Domingo was out of the country. *DeMarco*, 809 A.2d at 259. Appellant argues that her fear of Domingo, specifically, a fear of violence being done to her and/or her children if she had reported Domingo's abuse or Charlenni's injuries, 'persisted' during this time; however, the presence of such fear, alone, is not the applicable standard. That fear must exist in a context where a person of "reasonable firmness" would not have sought help for this chronically abused child. *See* 18 Pa.C.S. § 309(a). The defense simply did not present facts sufficient to permit the jury to reach that conclusion.

Although there is no case law directly on point, our conclusion is supported generally by a survey of duress-related case law. In each of the following cases, where it was found that a duress instruction was required, the evidence of threatened (or inflicted) harm was far more "present and impending" than in the present case. *DeMarco*, 809 A.2d at 259. For instance, in *Markman*, the defendant had been "subjected to duress by [her codefendant] during and immediately prior to the kidnapping and homicide"

for which she was convicted. ***Markman***, 916 A.2d at 609. Despite contrary evidence that ***Markman*** potentially had numerous opportunities to abandon the joint criminal enterprise,

> there was also evidence to the effect that: [Markman] had been subjected to terrorization, assaults, and death threats over a two-day period immediately prior to these events; she had already tried to escape through both the front and back doors of the trailer, and each time had been violently restrained from doing so by [the codefendant]; and [the codefendant] was at all relevant times in close proximity to [Markman] and in possession of a hunting knife.

***Id.***

In ***DeMarco***, the defendant, charged with perjury and related offenses, claimed they were committed under duress, but was refused a duress jury instruction. Our Supreme Court reversed his conviction because it found "the evidence introduced at trial was sufficient to create an issue of fact for the jury regarding whether Appellant was subject to duress under Section 309 and whether the exception in Section 309(b) applie[d]." ***DeMarco***, 809 A.2d at 264. DeMarco made false statements to authorities about another man's, Frank Larwa's, involvement in damaging two cars, but DeMarco had presented evidence that:

> Larwa shot him with a B.B. Gun, choked him, and threatened to deprive him of his social security checks or kill him if he did not corroborate Larwa's account of how his cars came to be damaged. Appellant also presented evidence of his situation when the threats occurred, including that he: (1) suffers from seizures, (2) is borderline mentally retarded with a third grade intellectual level, (3) receives social security because he is mentally disabled, and (4) was living with Larwa without

transportation or sufficient money to move to alternative housing.

*Id.* at 263 (footnote omitted).

In both ***DeMarco*** and ***Markman***, the evidence clearly showed that the threats giving rise to the appellants' duress claims were made just prior to, or contemporaneous with, the criminal acts for which they were convicted. By contrast, in ***Commonwealth v. Pelzer***, 612 A.2d 407 (Pa. 1992), our Supreme Court held the defendant was not entitled to a duress instruction in a case involving the kidnapping and murder of a sixteen-year-old boy, Alexander Porter, by the appellant and two cohorts, including Henry Daniels. Pelzer had admitted to participating in the kidnapping, and "admitted firing the shots wounding Porter's neck and back, but claimed that he did so only because Daniels pointed a gun at his head and told him to shoot Porter." *Id.* at 413. However, while Porter was being held by his kidnappers for over two days, Appellant left his cohorts on multiple occasions; yet, he repeatedly returned to them. Our Supreme Court held that it was

> abundantly clear that [the] appellant had frequent opportunities to withdraw from the conspiracy if that had been his intent, but he repeatedly returned voluntarily to continue the criminal operation. His self-serving statement also implies that throughout the episode he was being coerced into participating in brutal acts which were repugnant to his kinder nature. Nothing, however, can be more obvious than that he knowingly placed himself [in] a situation in which it was probable that he would be subjected to duress. As a matter of law, then, the defense of duress was not available to [the] appellant. His own assertions defeated any claim of duress, and there was no other evidence supporting the defense, so it was proper for the trial court to refuse to charge the jury on duress.

*Id.* at 414.  Thus, despite Pelzer's factual claim that he was forced to shoot Porter at gunpoint, our Supreme Court affirmed the rejection of a duress jury instruction because certain other undisputed facts clearly established that Section 309(b)'s duress defense exception applied.   Similarly, here, despite evidence that Appellant was terrorized by Domingo over several years, it was undisputed that he was out of the country for an entire month just prior to Charlenni's death.

Moreover, even if the jury believed that Appellant was under surveillance by third-parties beholden to Domingo during this time,[3] telephone-based threats would not constitute an immediate threat of harm comparable to that at issue in *DeMarco* or *Markman*.   As the Commonwealth notes, we have previously rejected claims that threats made over the telephone permitted a justification defense to illegally carrying a firearm.  *See Commonwealth v. Merriwether*, 555 A.2d 906 (Pa. Super. 1989) (holding threats of violence received by the defendant over the telephone "do not constitute [a threat of] clear and imminent harm" because "he could have notified the authorities and informed them of these threats").  Thus, for all the aforementioned reasons, we conclude that the trial court did

_____

[3] Although Appellant testified to this effect, the trial court indicates, as noted above, that there was no testimony regarding specific phone calls or other surveillance by such third-parties during the month prior to Charlenni's death.

not abuse its discretion, or otherwise commit an error of law, when it refused to instruct the jury on the defense of duress.

Next, Appellant contends that the prosecutor engaged in prosecutorial misconduct during the Commonwealth's closing argument. She argues: "By claiming that Dr. Arden 'made up a finding in order to come to the conclusion that he was being paid to come to,' the prosecutor was arguing implicitly that defense counsel connived to pay Dr. Arden to render a false opinion." Appellant's Brief, at 20.

> It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. **Commonwealth v. Paddy**, [] 800 A.2d 294, 316 ([Pa.] 2002). Further, prosecutorial misconduct does not take place unless the "unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." **Id.** Prosecutorial misconduct is evaluated under a harmless error standard. **Commonwealth v. Cousar**, [] 928 A.2d 1025, 1042 ([Pa.] 2007).

**Commonwealth v. Holley**, 945 A.2d 241, 250 (Pa. Super. 2008).

Appellant presents a two-stage argument regarding the Commonwealth's comments about Dr. Arden's credibility. First, Appellant argues that there is no evidence that Dr. Arden 'made up' any of his findings, much less that he did so deliberately in exchange for payment. Essentially, Appellant contests that the prosecutor's comment was not premised on any fact adduced at trial or any reasonable inference derived from those facts. Second, Appellant contends that this misconduct was not

harmless error, "because the statements not only challenged Dr. Arden's credibility[,] they [also] constituted an attack on defense counsel and the legitimacy of his having retained an expert with the court's approval." Appellant's Brief, at 27.

We need not reach the second part of Appellant's claim, because Appellant has simply failed to meet her burden to demonstrate that misconduct occurred. The critical issue addressed by the prosecutor's comment was with regard to a specific rib fracture sustained by Charlenni. The Commonwealth's expert and Dr. Arden agreed that this rib injury was the ultimate cause of death; however, they differed in their respective estimates of when Charlenni likely sustained that injury. The Commonwealth's expert estimated that the injury occurred between 8-15 days before Charlenni's death. Dr. Arden believed the injury could have occurred as recently as 2-4 days before her death. These experts' testimony was critical because other evidence had established that Domingo arrived home from the Dominican Republic approximately three days before Charlenni's death. Thus, the Commonwealth's expert's testimony eliminated Domingo as a potential cause of that injury, whereas Dr. Arden's expert testimony did not. Therefore, resolution of this conflicting evidence was essential to establishing Appellant's causation of Charlenni's death and, consequently, her culpability for homicide.

Dr. Arden's estimate of the timing of the injury was based, in some part, on the formation of a callus on the damaged rib following the injury.

Dr. Arden testified during direct examination that the X-ray of the injury showed "just the barest hint of a visible callus." N.T., 2/10/15, at 35. Later, during cross-examination, Dr. Arden conceded that "the barest hint of [a] visible callus … cannot be seen on [an] X-ray prior to one week." *Id.* at 59. He then stated, based on the microscopic evidence that, "knowing what I know, that's not a callus, no." *Id.* at 60.

It is certainly true that Dr. Arden could have been giving a nuanced opinion that only appeared to differ from his prior statement when pressed for specificity beyond what the evidence could actually provide. Dr. Arden repeatedly made the point that what he may have perceived, visually, on the X-ray was not supported by the microscopic examination of the injury. *Id.* at 59 (stating that "*the totality of the findings* of *both that X-ray and the microscopic examination* do not describe a true soft callus and do not get to the state of a minimum of a week") (emphasis added). Nevertheless, there was enough of an apparent contradiction to permit an inference (albeit not the only possible inference), that Dr. Arden had changed his mind between direct- and cross-examination. Importantly, however, Appellant makes no attempts in her brief to establish, by reference to the facts and testimony of record, why such an inference was not possible or, otherwise, not reasonable.

Additionally, as the trial court notes, Dr. Arden testified during *voir dire*, and without objection, that "he was being privately retained and paid for his consultation."[4]  TCO, at 23 (citing N.T., 2/10/15, at 14-15).  Thus, the fact that Dr. Arden was paid for his work in this case, and the fact that a reasonable inference could be drawn that Dr. Arden changed his testimony between direct- and cross-examination, allowed the prosecutor to make his case to the jury that Dr. Arden's testimony was biased by a financial motivation.

We note that while it is improper for a prosecutor to express his "personal belief as to the credibility of the defendant or other witnesses[,]" "a prosecutor may comment on the credibility of witnesses." ***Commonwealth v. Chmiel***, 889 A.2d 501, 544 (Pa. 2005).  Moreover, "[p]rosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." ***Commonwealth v. Hawkins***, 701 A.2d 492, 503 (Pa. 1997).

_____

[4] This was probably not objectionable in any event.  Dr. Arden was responding to *voir dire* questions presented by defense counsel, and:

> Impeachment of an expert witness by demonstrating partiality is permissible.  ***Smith v. Celotex Corp.***, []564 A.2d 209, 214 ([Pa. Super.] 1989) (citing ***Grutski v. Kline***, []43 A.2d 142 ([Pa.] 1945)).  It is proper to ask an expert witness his fee for testifying, as well as whether he has a personal friendship with the party or counsel calling him.

***J.S. v. Whetzel***, 860 A.2d 1112, 1120 (Pa. Super. 2004).

Here, we conclude that Appellant has failed to convince this Court that the prosecutor's comment was anything more than oratorical flair, or that it had no foundation in Dr. Arden's testimony and proper inferences derived therefrom. Thus, we find this matter comparable to language we permitted in ***Commonwealth v. Smith***, 995 A.2d 1143, 1162-63 (Pa. Super. 2010) (holding permissible a prosecutor's statement, that the defense expert was a "hired gun," where the credibility of his testimony was called into doubt during cross-examination, and where he testified that he primarily worked as a defense expert). Thus, having concluded that there was no prosecutorial misconduct, we need not consider Appellant's harmless error argument.

Judgment of Sentence ***affirmed***.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/20/2016